VeraChem Holdings v. Volkswagen, 2016-26-19. Mr. Resser. Thank you, Your Honor, and may it please the Court. I want to spend a few words on the issue of standing, because Volkswagen has argued that we would not have standing to challenge the Board's time construction. American Holding had claims that were challenged in IPR, and those claims were found unpatentable. We are asking this Court to review that finding, and because of the Board's erroneous claim construction, we need to address the issue of claim construction in order to form a basis for review of the unpatentability finding. And so we submit that that provides ample standing for us to challenge the Board's claim construction. Volkswagen has also argued that the Board's claim construction is in fact identical to the one that we had used in our proceedings in the IPR. That's not correct. The history of the claim construction is that the petitioner in Volkswagen took the position that the claim term meant that the absorber was coated over the oxidation catalyst, but that the oxidation catalyst would still be accessible to the reactants either directly or by diffusion. In our reply, we agreed with that position, but we added an additional requirement, and the additional requirement was that there be sufficient absorber material to form a monolayer. Importantly, in our claim construction, we do not require that a monolayer in fact be formed. And we do not require that if a monolayer is formed, that that would prevent some of the oxidation catalyst to be directly accessible to the reactants. The history of the claim limitation is that during prosecution, the patent came up against a prior art reference in which barium was used to stabilize the alumina support. And in that context, a small amount of barium was used, and it was contacted with the support prior to deposition of the oxidation catalyst. And in making or in defending the claim limitation, the patent attorneys for Americam at the time referred to the method by which the catalyst was made. They did not refer to the drawings 1A through 1C. They relied on the method by which the catalyst was made, which shows that the oxidation catalyst is deposited first and then coated over with the absorption material. And also that the amount of absorption material is far greater than what was used in the when prior art. And that was the basis for the entirely and intimately coating language. The board takes it a step further and now requires that actually a monolayer be formed. And not just that, but that that monolayer prevents direct access of the reactants to the oxidation catalyst. That is not consistent with any of the evidence that was developed during the IPR proceedings. And it is also not consistent with the positions that the parties have taken during the IPR. This is a composition claim. This composition claim process would seem to be irrelevant. And all it consists of is an oxidation catalyst coated with a carbonate or hydroxide of an alkali metal. And why isn't that anticipated or rendered obvious by Hoekstra? Well, the experts for both parties were asked to give their point of view on what that wording meant. And they opined that it meant that the oxidation catalyst was deposited first. And then to prevent it from leaching out when the aqueous solution of the absorbent material was applied, there should be some step in between to fix the... That is true, Your Honor. And it has been our position throughout that this claim limitation should be read as a product by process claim limitation. And if it is not, then the prior art references that the board relied upon to find the claims unpatentable do not provide a description of the materials that these prior art materials contain. The prior art references contain descriptions of the method by which these materials were made. And the experts for both sides were quite comfortable translating that to determination as to whether the materials of the prior art would anticipate the claim. That has been the method by which both the petitioner and American Holding have been dealing with prior art references. If there is a requirement that you actually know that there is an uninterrupted monolayer coated over the oxidation catalyst, then it's our submission the prior art falls far short of that because all information that is provided to us by the prior art is the way by which it was made. And so in that sense, the board's position was entirely inconsistent because on the one hand, they formulate the claim construction that requires that a monolayer actually be formed but then in analyzing the prior art, the board is happy to rely on just the description of the method by which the prior art materials were made. So it can both be correct. Either we settle on a claim construction that allows us to analyze prior art based on the description of how these materials were made and Volkswagen, in fact, is doing that. When they argue in their brief that, first of all, that the preferred embodiment is within Claim 1, they refer to the description of the patent as to how the preferred embodiment was made. They do not say, oh, and by the way, there's evidence that a monolayer was formed and that this monolayer prevented direct contact of the reactants with the oxidation catalyst because that evidence isn't there. So when they argue that the claim as constructed by the board encompasses the preferred embodiment, they fully rely and solely rely on the description of how it was made. When they argue that there was substantial evidence to support the finding of unpatentability, they refer again to descriptions in the prior art of how the prior art materials were made. So there is a consensus, even today between the parties, that this claim limitation should be read as a product by process claim limitation because that is the only information we typically have available. Anything further? I would like to, I have about five more minutes. I would like to save that for rebuttal unless the Court has any questions at this point. We will save that for you. Mr. Meyer. Good morning, Your Honors. May it please the Court. With respect to the position of whether or not Americam has standing, the issue really is a prudential rule regarding the need for this Court to construe the limitation. Patent owner Americam takes the position that none of the challenged claims are unpatentable under the board's claim construction. Patent owner never argued that the construction it urges this Court to adopt distinguishes over the prior art. In fact, at page 43 footnote 3 of its opening brief, patent owner admits that under the broad construction it urges this Court to adopt, instead claims 1, 7, 8, 14 through 17, 19, and 31 are unpatentable based on styles. And we noted this two times in our brief at pages 22 and 23, yet they never disputed this in their reply. So therefore, under the vivid technologies case, there is no need for this Court to construe this limitation. Secondly, they won on this limitation. They urged the inclusion of this provision that a monolayer, that there be sufficient material to form a monolayer. And the Court adopted that, and they, the Court, I'm sorry, the board accepted their argument relying upon that construction to find that Kinoshita is not invalidating. Now ---- Kennedy. Counselor, a problem I had with the case, or that maybe I still have questions, is whether the board over-relied on the figures and decided this case based on looking at the different figures. What other evidence did the board rely on other than just the figures?  They also relied upon the plain and ordinary meaning of entirely coded. What the board said in its decision on rehearing was, in the final written decision, we did not ignore witness testimony. We discussed the testimony at some length. We chose to credit the precise, plain, and ordinary meaning of the language to the claim, aided by the prosecution history and intrinsic evidence of the specification, including the figures. So they relied upon it all, and if I could refer you to the figures, it appears at appendix page 99. There's figure 1A and figure 1B. In their reply at page 13, they say the schematic drawings do not show any pore structure in support 10. That is incorrect. Figure 1B is one pore. And the description of the drawing states that figure 1B is magnified drawing of a portion of the surface of the catalyst absorber sphere. And that's at appendix page 104, column 3, lines 38 through 40. Then later on in the text of the specification, it states, as shown in figure 1B, the surface of the sphere is very irregular so that there is an extremely large surface area per gram of material as described herein. Now, if you go to Dr. Ferrato's declaration, what he said at appendix page 600, paragraph 22, 21 and 22, he says that a support is usually a high surface area inorganic material containing a complex pore structure throughout which catalytic materials such as platinum and palladium are deposited. And that's paragraph 21. Paragraph 22, he states the size and number of the pores determine the support's surface area. That is, the surface area of the support includes all of the internal areas formed by each and every pore. We've got these pores that go like this. And that's exactly what is shown in figure 1B. Now, they also point to some of Dr. Ferrato's testimony regarding the use of the word porosity in the context of the absorber. And there what he said was the absorber still has to have porosity to allow the gases to diffuse through the coating to arrive at the platinum sites or whatever catalytic material sites in order for the catalytic reaction to occur. So he uses porosity to connote diffusion. And what they're doing in their brief, they point to the use of porosity with respect to the high surface area support, which is just some pores going up and down, not all the way through, and those are filled with the platinum and also the absorber. And then they mention porosity of the absorber. And Dr. Ferrato used the word porosity to connote diffusivity. And that's clear through all of the passages that they cite and that they quote in their brief. Also, I would like to turn now to Hoekstra. In their reply at page 15, they state, the U.S. file history was unavailable to members of the public for the Hoekstra patent. That is not true. At appendix page 312, the board stated that the file wrapper was available to the public on the issue date of Hoekstra, November 15, 1994. So that was a finding of the board, and their unsupported statement that the file history was unavailable to the members of the public has no support and does not contradict the finding of fact made by the board. Why does that matter? Because Hoekstra is a reference for what it discloses, not what its file wrapper contains. Yes. They're arguing that there was a typo in the issued patent of Hoekstra, and the board is taking the position that there was a 312 amendment, even though it wasn't incorporated into the issued patent, it was available and became a published application as of the issued date of the patent, because the application itself, the prosecution history was publicly available. Now, with respect to Hoekstra, our expert says that the absorber will completely coat over the platinum group component, and he used the phrase completely coated, and in Dr. Crocker's declaration, he recognized that we were arguing that the absorber was completely coating the platinum. Now, I'd like to take a step back to address some of the arguments that they made about the construction of this claim. First, with respect to product by process limitation. A product by process limitation has no value with respect to the validity or invalidity of the patent. It does not provide patentable distinction. If the end product is the same, and it's a product claim, and if it has a product by process limitation in it, if the product is the same, the claimed product and the prior art product has the same physical characteristics and properties. In other words, an old product doesn't become new by being made by a different process. Correct, yes, absolutely. And also, with respect to their argument that they don't require a monolayer to be formed, then why do we have this limitation? They're claiming, let's say each sheet of paper is a monolayer of absorbent, and I have a pad, and if I take out each paper, I can cover the whole table, and it would be covered by a monolayer. What they're saying is, if you put it right here, pile it up in a corner of the high surface area, that's sufficient. But that does not satisfy the limitation that requires the catalytic component to be intimately and entirely coated by the absorbent. So if you put it all over here, whatever other catalyst is distributed on the high surface area represented by this table, it is not covered by the monolayer. So this limitation is not effective to show satisfaction of this limitation, so therefore it can't be an acceptable definition of this. And we pointed this out in our opening brief, I'm sorry, in our responding brief, and they did not respond to that argument in their reply brief. They haven't pointed to any intrinsic evidence that says, aha, if you have enough to cover it, you really don't have to cover it, you can have a pile on the edge, and that's sufficient. There is no evidence supporting that. Okay. Yes. And with respect to entirely, we asked their expert what he considered the scope of this limitation to argue, and he said, my understanding of the term is that the platinum particles are entirely coated, and that therefore in principle there shouldn't be any exposed atoms. And I responded, okay, not a single one. And he said, if one uses a dictionary definition of entirely, then the logical implication would be that there are no exposed platinum atoms. And that's true. And that's what the board was relying upon, the meaning, the ordinary meaning of the word entirely. And if you give that word its ordinary meaning, completely covered, then their definition of a monolayer is insufficient if you can pile it up on the side. It has to be evenly spread out. So there must be a monolayer, and that's what the court decided. And it's consistent with the dictionary definition. And with respect to our expert's testimony, he said that there are two possibilities with respect to this claim term. It can either be by diffusion, and let's not lose track of what that means. With diffusion, the gas passes through, it diffuses through the absorbent, and it does contact the catalyst. So the reaction occurs. It's not like we're somehow rendering the claim inoperable, or the board rendered it inoperable by saying that it can only pass through by diffusion. And so the board, our expert proposed two alternative situations, either by diffusion or there's gaps or cracks that would allow it to come through. And with respect to Takashima, we relied upon that aspect. With respect to Hoekstra, Inouye, and Stiles, we relied upon the first configuration that is encompassed within that proposed definition. So the fact that the board adopted only the first prong by diffusion does not mean that there is no evidence. There is evidence. There's substantial evidence, and we cited to that in our reply brief. And with that, if you do not have any questions for me on any of the grounds, I will sit down. Thank you, Mr. Meyer. Rassler has a few minutes left for rebuttal if he needs it. Taking up the last point first, it's not just that the board focused on one embodiment where the reactants would contact the oxidation catalyst by diffusion. They specifically ruled out the other embodiment where the reactants would be able to contact the oxidation catalyst directly. And that is problematic for Volkswagen's position because their evidence does not exclude that the prior art may contain materials that allowed for direct access. You can't. I mean, the Dr. Crocker, the expert for America, explained that to really know what this catalyst looks like, you have to conduct some very sophisticated analysis. You cannot just deduce that from the way the catalyst was made. Dr. Farodo, Volkswagen's expert, explained that even if you form a monolayer, you cannot be sure that there may not be unexposed oxidation catalyst atoms as well because there could be preferential deposition of the... What should we view, counselor, the expert testimony on the definition of entirely? What should we view that as substantial evidence? Both experts were asked to give their opinion of what the claim meant. And they both agreed that the claim encompassed embodiments in which the reactants would have to contact the oxidation catalyst directly. And that was consistent with their testimony that when you form a monolayer, you can't be sure that there aren't any cracks or that there aren't somewhere some exposed oxidation catalyst atoms that would allow direct access. So they know full well, they have both worked with these materials, and they know that you do the best you can in making your catalyst, but you have no control over what happens on a molecular scale. And in order to determine what has in fact happened, you would have to conduct very sophisticated analyses. And even then, of course, that requires a very large enlargement, which by implication means that you're looking at a very small sample of your catalyst. And so even if you see in your analyses that the area that you're looking at shows an uninterrupted layer and there's no exposed platinum atoms at all, you don't know what it looks like two centimeters from where you happen to be doing your test. So these are people from the real world, from practice, and they know that Dr. Faroda used the term idealized situation. Yes, we can do these calculations, we can determine whether there's enough there to form a monolayer, but that's an idealized world. And in reality, you may have situations where the absorber material may cluster and may leave platinum atoms unexposed. If the board's interpretation is correct, and if the claim is limited to the embodiment where all of the platinum, all of the oxidation catalyst atoms are coated and only accessible by diffusion, then there is no evidence that the prior art actually meets that claim limitation. So the finding of unpatentability is entirely inconsistent with the available evidence. Now, Volkswagen would have us rub our hands and say, nice, we got a very narrow claim interpretation and that makes it easy for us to pull our claims out of the fire. But we cannot do that. We cannot ignore all the evidence that was developed saying these materials in real life will have cracks in this coating and will have atoms that are directly accessible. And it's still unclear to me how Volkswagen could say, on the one hand, this is the correct claim interpretation, and on the other hand, then analyze the prior art as if those requirements were not there. I see my time is up. If the court has no further questions, I'll rest.